We'll hear an argument next in 21A240, Biden, President of the United States v. Missouri and the consolidated case. Mr. Fletcher. Thank you, Mr. Chief Justice, and may it please the court. Hospitals, nursing homes, and other Medicare and Medicaid providers serve patients who are especially vulnerable to COVID-19 in settings that are especially conducive to the spread of the their staff are vaccinated, subject to medical and religious exemptions, because he found that vaccination is the best way to prevent workers from infecting their patients with a potentially deadly disease. He also found that any delay in implementing that requirement would cause preventable deaths and severe illnesses. But the preliminary injunctions in these cases are delaying that urgently needed protection for Medicaid and Medicare patients in half the country. This court should stay those injunctions for two reasons. First, requiring medical staff vaccination during a pandemic falls squarely within the Secretary's statutory authority to protect the health and safety of Medicare and Medicaid patients. Vaccination requirements are a traditional and common way to curb the spread of infectious disease. Many healthcare workers are already required to be vaccinated against diseases like hepatitis, measles, and the flu, and the medical community overwhelmingly supports COVID-19 vaccination requirements, which have been adopted by providers around the country. Those requirements are, in short, the paradigmatic example of a health and safety measure. Second, the Secretary's decision was thoroughly explained and supported by the record. The states do not seriously deny that requiring vaccination will save lives. Instead, they predict that it will cause staffing shortages, especially in some rural areas. But the Secretary carefully considered that concern. He explained that experience from around the country shows that most workers will choose to be vaccinated rather than to leave their jobs in response to vaccination requirements. And he concluded that the risk of some temporary staffing shortages is outweighed by the urgent need to protect all Medicare and Medicaid patients during a deadly pandemic. Congress assigned those quintessential predictive and policy judgments to the Secretary, and the states have identified no basis to disturb his conclusions. I'd welcome the court's questions. Counsel, are you relying on 1302A? The Secretary invoked that's the Secretary's general rulemaking authority under the Social Security Act, and he invoked that general rulemaking authority as he typically does when he makes rules under the Act. But we're not relying primarily on that. We're instead relying on specific authorities as to each category of covered providers that allow the Secretary to set standards that set the requirements for their participation in Medicare and Medicaid. I don't understand what you just said. I'm sorry. The answer is yes, but not only on 1302. We also have specific statutes that speak to each of the covered providers here. So if I look at the language in 1302, which says that you, that the Secretary shall make and publish such rules and regulations as may be necessary to the efficient administration of the functions with which each is charged under this chapter, you say there is more than that authorizing the Secretary? Correct, yes. What is that more? So the more is set forth that it's different as to each category of providers. So take hospitals, there the additional authority is in section 1395XE9, which authorizes the Secretary to set such requirements as he finds necessary in the interest of the health and Medicaid. The Secretary cited other similar requirements that authorize him to set conditions of participation for each of the categories of providers. For nursing homes, for ambulatory surgical centers, all of those categories of providers are subject to similar requirements that say the Secretary gets to determine the requirements for their participation in Medicare and Medicaid. The Secretary has long relied on those specific statutory authorities to set forth detailed conditions of participation that are in the Code of Federal Regulations. And what he did here was say, I'm going to add an additional condition of participation pursuant to those specific authorities for each category of provider requiring vaccination against COVID-19. Has that been used in the past, the argument or the authority that you just set out, has that been used to require vaccinations in the past? It has not, no. But the Secretary explained why not. He explained that this is a unique pandemic where we have unique access to effective vaccines. So he explained that in other settings, health care workers are typically vaccinated against communicable diseases because they got them during childhood when all of us did, or because state authorities have required vaccinations. But this is a uniquely deadly pandemic that because it is so new, those requirements haven't caught up and ensured the level of staff vaccination that you see in the context of other diseases. And that's why he found it necessary to step in with this. One last, just a question. Don't you think it's a bit curious that you're placing significant reliance on a provision that speaks about necessary to the efficient administration to administer a vaccine that could have significant health consequences? Justice Thomas, I don't. So first of all, I just want to be clear again, I'm not claiming that that general authority alone would authorize the vaccination requirement. We're resting on the conditions specific to each category provider, the vast majority of which, the ones covering 97 percent of the workers affected by this rule specifically reference conditions aimed at health and safety. I think when you look at it in that context, it's clear that this is a paradigmatic health and safety requirement. Counsel, in which case is the relationship between the agency closer to the COVID-19 danger in this CMS case that you're arguing before us now or in the OSHA case that your boss just finished arguing? I think they're both they're different cases. I think it's hard to say which one is closer. The OSHA case, the OSHA act gives the secretary of labor responsibility for workplace safety. And you just heard why the COVID-19 pandemic is a grave threat in the workplace. CMS has authority to protect the health and safety of patients in Medicare and Medicaid and explained at length why the COVID-19 pandemic is an acute danger to patients in that setting. So I think they're both very close. Well, maybe expand it, which is a more acute danger OSHA CMS or the federal contractor vaccine mandate? Well, I think all of them. I think this to the question you asked my boss earlier, which is, you know, the government is doing a lot of things in response to the pandemic. And I don't think that's a surprise. This is an unprecedented pandemic that touches virtually every aspect of American life. And so it does affect the authorities of lots of different federal agencies. You think the government has picked the three most pressing areas to address and they're doing it in order or why OSHA, why CMS, why federal contractors, why not any host of other areas that are also, you know, where COVID-19 is also a serious problem? Well, because the federal government is, as some of the questions earlier have suggested, a government with limited powers. Federal agencies have the authorities that Congress has given them. Congress has made OSHA responsible for workplace safety. Congress has made CMS responsible for Medicaid and Medicare patient safety. And those agencies have determined and explained their conclusions why those authorities are by the sort of unique threat that the COVID-19 pandemic poses in both contexts. I thought you might have said, and it may have been uncomfortable, but I thought you might have said we're dealing here in this case with health care, with Medicare and Medicaid. And what could be closer to addressing the COVID-19 problem to health than health care? I mean, people already get sick when they go to the hospital, but if they go and face COVID-19 concerns, well, that's much worse. On the other hand, OSHA, its workplace, yes, COVID is a problem in the workplace and in some situations it may be a more serious problem. But it seems to me that if any of the three that I've been talking about anyway present a close connection, it would surely be between a health threat like COVID-19 and the government's health care. Mr. Chief Justice, I certainly don't want to disagree with that at all. I think there is an acute threat that COVID-19 poses in health care settings. We've seen that throughout the pandemic, especially in nursing homes and other congregate care settings, which are within the scope of this rule. I absolutely agree that Americans shouldn't be forced to choose between getting medical care and exposing themselves unnecessarily to a virus. And as we explained, health care workers have long been expected to take extra precautions, including vaccinations, in order to prevent them from infecting their patients. So I don't disagree with any of that. But in making all of those points, I don't want to undersell also everything you heard about in the first case, about the grave danger that the pandemic poses for workers as well in a way that implicates OSHA's authority. Counsel, there is another significant difference that you haven't talked about. This is a spending clause case and not a general powers case. And I always thought that when you're talking about spending clause, that the government has more power to define where it wants to spend its money, correct? Absolutely. And to that extent, one of the major arguments raised by the other side here that I want you to address is what they describe as the enormous cost that this will affect on hospitals and the fact that it's in terms of what CMS generally does. I can. And first, if I could, I'd like to put in context the cost. I think the secretary's cost estimate was on the order of one point three billion dollars, much of which will be borne by the federal government, which covers the cost of vaccinations. He put that in context by emphasizing that health care spending in this country is four trillion dollars and that the costs in this case amount to about one hundred and twenty five dollars per I think it is not at all unprecedented for the secretary to exercise the same authorities that I was discussing with Justice Thomas here, the authorities to set conditions of participation for hospitals and other providers in Medicare and Medicaid to impose very detailed, very prescriptive requirements that would have very high compliance costs. This is not a place where it's unfamiliar to have the secretary involved in the details of the management of they would be subject to vaccination requirements for staff at their state run facilities. So the facilities and this applies to all facilities in Medicaid and Medicare, not to the states as the administrators of their own Medicaid programs. But I acknowledge states do have state run facilities. All of them are on notice that they're subject to the health and safety requirements that the secretary may adopt from time to time. Obviously, they didn't have specific notice of the vaccination requirement because it didn't exist until the pandemic came about. But the way that the program operates is that all providers are on notice that they have to comply with the secretary's regulations, which could change. So if they read the statutes that you are now relying on primarily, that would provide them clear notice that they might be subject to something like this vaccination requirement. It would put them on clear notice that they are subject to such requirements as the secretary finds necessary in the interests of patient health and safety, which have long included infection control. In the past, that's been general. It's been requiring infection control plans that meet national guidelines, fire preparedness, emergency safety, things of that nature. So they have long been on notice that they are subject to requirements by the secretary in the interest of patient health and safety. And I think this is a heartland case of a measure to protect patient health and safety in the midst of a pandemic. I don't have before me the particular statutory provision that you spoke of earlier, but is it the case that some of many, if not all, of these additional statutory provisions on which you are now placing your principal reliance are definitional provisions rather than provisions that expressly authorize the secretary to promulgate regulations? Is that correct or incorrect? They're both. So there are definitions. The provision I quoted earlier, 1395XE, is the definition of a hospital for purposes of the statute. But in that definition, it says a hospital. And what that means to be a hospital is to be eligible for Medicare reimbursement. What it means to be a hospital is to meet the following specified requirements, including such other requirements as the secretary finds necessary. Right. But it doesn't say the secretary is authorized to promulgate any regulations that protect the health and welfare of people in a hospital or in any of these other facilities. It says that the definition of a hospital and the definitions of these other facilities, by definition, they are facilities that are required to comply with regulations. As the secretary finds necessary in the interest of patient health and safety, yes. Is there any limit to that power? What could the secretary, what, if anything, could the secretary not do if the secretary finds that something is necessary to protect the health and safety of people in those facilities? Well, I think the secretary, the major limit is the one in the text of the statute itself. The secretary has to find that it's a requirement that's in the interest of patient health and safety as the secretary did here. I think the other constraints on that authority are the way you know that this provision is within the secretary's authority is that you see providers adopting it on their own. You see medical societies like the American Hospital Association, the AMA, the American Nurses Association recommending this policy. You see some states adopting this policy. I think all of those things are powerful confirmations that this is a routine, common, effective measure for protecting patient health and safety. One of the arguments on the other side is that you were required by statute to consult with the what is your response to that? There is a provision of the statute that says that when the secretary sets conditions of participation for some of the providers at issue here in carrying out that function, he shall consult with the states. The statute doesn't say that that consultation has to happen before rulemaking and the way that the secretary has long understood that to function is to require consultation in conjunction with the notice and comment process. Isn't that an odd understanding of a consultation requirement? We're going to tell you to do something and then after we've told you to do it, we're going to consult with you about what we've already said you have to do. I don't think so, Justice Alito. In the context of the provisions of the statute that also contemplate, as the APA does, that in some circumstances, the secretary will have good cause to act without notice and comment. So in the ordinary case, there's going to be notice and public comment, which has the benefits that Justice Barrett referred to earlier. When that happens, you should also be sure you consult with the states and with accrediting boards. But when there's good cause to skip that, the agency has long interpreted that to mean that it can defer consultation with the states to the parallel public comment process. But is there a good cause exception in the provision that requires consultation? There isn't, but there's no temporal requirement at all. So it's actually the other side that's asking you to read into that, a requirement that had happened before rulemaking, and to make that requirement apply even when the good cause exception is satisfied. And we don't think there's any basis to do that, certainly not in the secretary's past practice. This has long been the way that the secretary has interpreted this provision in conjunction with the good cause exception to notice and comment. Mr. Fletcher, can I follow up on the questions that Justice Thomas and Justice Alito have been asking about the facility-specific statutes? I think it was wise to shift your focus to those because of their references to health and safety. But I find it difficult because the language of each of those statutes is different, and not all of them reference health and safety. So, for example, I think the one on long-term care facilities is your best because that's the one that also refers to or requires skilled nursing facilities to establish and maintain an infection control program. That one, I think, gives you a stronger case than the ones that don't mention health and safety at all. Or, for example, for ambulatory surgical centers, you know, the provision on which you rely describes the benefits provided to an individual, and then it lists the kind of services that would be covered, right? And then, parenthetically, it says, performed at an ambulatory surgical center, parentheses, that meets health and safety and other standards specified by the secretary. It seems to me a heavier list to say that that kind of aside in a parenthetical is a grant of authority to CMS to impose this kind of vaccination requirement on those who work at the ambulatory surgical center. So, I guess my question is this. One, you know, the government here seeking the stay of the injunction has the burden of showing likelihood of success in the merits, and I understand because of space limits and the number of statutes on which you're now relying, it would be hard to make the specific case for each of these provisions. But what if I think some of the provisions might support you and others don't? This was an omnibus rule, and even though the provisions, we don't really have before us the structural and textual arguments directed at each of these provisions. So, what if I think some do and some don't? In an omnibus rule, what am I supposed to do? Well, so we agree entirely that the focus ought to be on the statutory text, and one of our complaints with the district court decisions in these cases is that they blew past all of those distinctions and didn't focus on the text at all. So, we absolutely agree the text of these provisions should be the court's focus. In terms of how to think about them, I understand it's 15 different provisions. I would group them into two categories. There are 11 or so that we say that pages 5 to 6 of our reply brief that include that specific health and safety language in different formulations, but all of them specifically referring to requirements in the interests of patient health and safety. As we've explained, we think that this is the paradigmatic health and safety regulation, and that's reinforced by the consensus of the medical community, by other regulators, by practices of providers. Now, there are a few statutes that we cite at page 9 of our reply brief that don't include that specific language. Those statutes are the ones applicable to providers that employ about 3% of all of the workers covered by the rule. Now, our view is that all of those statutes still give the secretary the authority to set standards or requirements for participating providers, and if you look at those provisions, what you find is that Congress was a little bit less detailed in the hospital provision of 1395XE9. The preceding eight sections all detail relatively nuanced, very specific requirements for hospitals, and then the E9 adds and such other requirements as may be necessary. What if I disagree? So, I understand that your position is that all of these granted the secretary authority, but what if I disagree? What if I say, for example, you suggested in a footnote in your reply brief that because such a small percentage of employees are covered by the statutes that don't reference health and safety, that we should just allow the injunction to remain in place only as to those? And let's say that I disagree with you that every single one of the statutes that references health and safety could be interpreted as a grant of rulemaking authority for the reason I suggested with ambulatory surgical centers. The rule is an omnibus rule. It wasn't adopted on a facility-by-facility basis, so if I assume the premise that I disagree with you that every single statute grants this authority, why shouldn't then we just leave the Fifth Circuit's injunction in place? Well, because I think to the extent you're looking at likelihood of success, that's the factor that this would be relevant to. I think that does depend, as you say, on the authorities as to each category of providers, and the secretary included, in some sense, it's an omnibus regulation. He did it all at once, but he included specific severability language that we cite in that footnote. It's at page 61,608 and said, if any of these provisions are no good, then the rest ought to stand. And so I think if you disagree with us on either the provisions that lack health and safety language or if you disagree with us on the ones that have it, although I want to talk about both of those things to hopefully persuade you otherwise, I think the result would be we don't have a likelihood of success at prevailing on those provisions. But that wouldn't justify allowing the injunctions to remain in place as to all of the other provisions, especially those that cover the vast majority of workers. So I think that's the approach we'd suggest if that's where you find yourself. Mr. Fletcher, I do understand that we could go provision by provision, but I thought in reading your brief that the general authority to pass regulations with respect to the secretary's functions, that all that you were saying is that generalized authority is well documented by the fact that in the vast majority of these, at least 11, if not 12, of these specific rules, they reference health and safety directly. Isn't that your point? That's our point. And in addition, that even as to the ones that don't reference health and safety, so the end-stage renal disease providers or the psychiatric residential treatment facilities, those categories, Justice Barrett and Justice Sotomayor, they still give the secretary even broader authority to set conditions for participation. And our view is that when the secretary is authorized to set conditions for participation in Medicare and Medicaid, that has to include the authority to set patient health and safety requirements. And in fact, that's the way the secretary has long interpreted them. If you look at the regulations that are amended by the provisions addressing those categories of providers, there are existing bodies of patient health and safety measures, in many cases addressing infection control already, in other cases addressing other matters directed at patient health and safety. So the secretary has long interpreted those more general grants of authority to include the authority to impose patient health and safety conditions. And we think that's the right way to read them in the context of the statute. I dare say that I looked at some of the regulations that issue here, not the ones you passed with respect to COVID, but other regulations. Is it fair to say that the vast majority of the regulations across all facilities relate to health and safety? I think that's fair. Yes, that's certainly consistent with my reading of the regulations applicable to the facility providers at issue here. It does seem that since it's a program to serve ill people, people with conditions like renal failure, psychiatric conditions, other conditions, that that would be the primary focus of contracting with places that are safe for those people, correct? Absolutely. And that's the way the secretary has always understood those more general authorities. Thank you. If I could say just a word about the other argument that the other side has pressed heavily in this case, and that's the concern about staffing shortages. That is a concern that secretary acknowledged and considered in the regulation. And he explained nonetheless that he was adopting a vaccination requirement for several reasons. First, he explained that experience from around the country has shown that even workers who express hesitancy or even strong objections to becoming vaccinated don't actually end up leaving their jobs in those large numbers when vaccination requirements are imposed, when their employers can help facilitate vaccination, can counsel them, that across the economy, including in the health care sector, including in rural areas, including health care systems in North Carolina and Indiana, the secretary found that vaccination requirements achieve very high levels of compliance. He sought comments on the issue. He welcomed input from stakeholders about the particular challenges faced by rural hospitals. But he also explained that any temporary staffing shortages are likely to be relatively minor in the context of this industry, which already faces enormous staff turnover over every year. He said the rate of staff turnover in the health care industry generally is about 25 percent in normal conditions, and that in those circumstances, any marginal additional turnover attributable to the vaccination requirement does not outweigh the need to impose this health and safety measure that, again, is supported by the medical community and has already been adopted by providers around the country. Thank you, counsel. Justice Thomas, Justice Breyer, anything further? Justice Alito? Justice Kagan? Mr. Fletcher, the states talk quite a bit about the time that it took the administration to get out the good cause rule and suggest that in that amount of time, it could have done a full notice and comment proceeding. I guess I would like you to comment on that. Is that true? It's not. For a number of reasons, I think the clearest is the provision governing notice and comment regulations that applies when good cause isn't found for the secretary. 1395HH says that the secretary has to allow a 60-day comment period, so that right there is more than two months. In addition to that, the secretary has to write the rule, which involves not just developing the regulation and fitting it into the existing conditions of participation for 15 different categories of providers, but also writing the detailed cost-benefit analysis and paperwork reduction act analysis that are required by statutes and executive orders and that occupy dozens of pages at the back end of the rule. So I think the suggestion that in two months, the agency could have completed notice and comment rulemaking is inconsistent with both the applicable legal requirements and just experience with regulatory process more generally. Yeah, I guess sort of for an ordinary person, an ordinary person might say, well, if it's really important, why don't you just work faster? I understand that. I mean, that doesn't get you around the 60-day time limit. And what I can tell you is that the secretary did work extremely fast, produced a 73-page rule in two months and explained why the rule was necessary, satisfied all of the legal requirements. And I think, you know, I don't want to fault my friends on the other side, but I think if the secretary had roughed something out with a less thorough explanation, I think we'd be hearing legal challenges that he hadn't adequately explained things or considered things or calculated out the cost benefits. I think agencies that are trying to make policies that will stick have to make sure that they engage in the kind of robust analysis and document that analysis in the way that the secretary did here. Justice Sotomayor? Anything further? Back to you. Justice Gorsuch. This statute, unlike the OSHA statute, actually contains an express limitation on the secretary's authority that we haven't yet discussed and that I know you're familiar with. Among other things, it says, you know, the secretary shall not control the tenure of employees at covered health care facilities or their compensation or their selection. And this regulation, arguably, the other side will say, I'm sure we're going to hear it, so I didn't want to have a chance. It's going to say this effectively controls the employment of individuals at these health care facilities in a way that Congress specifically prohibited. As I understand your response, it is we're just providing money, we're not providing money. And by withholding money, we're not controlling who you hire. And I might understand that in some circumstances, but in a statute where everything is about spending, it's a spending clause statute, I would have thought that Congress would have understood and we should interpret this language in that light, that you cannot use the money as a weapon to control these things. And in fact, of course, as you know, the court has some anti-commandeering law that's doctrinal speak for you can't always use money without and claim you're not controlling what's going on. And I wonder whether we should take particular cognizance of that here, given that these statutes sometimes constitute, we're governments receive. This regulation affects, we're told, 10 million health care workers and will cost over a billion dollars for employers to comply with. So what's your reaction to that? Why isn't this a regulation that effectively controls the employment and tenure of health care workers at hospitals, an issue Congress said the agency didn't have the authority that should be left to the states to regulate? So Justice Gorsuch, you're talking about Section 1395. And that says that nothing in the Medicaid Act shall be or Medicare Act shall be interpreted to authorize any federal official to control, as you say, tenure, staffing, the practice of medicine or the administration of entities. We read as the Secretary has long read that to mean that he can't dictate particular decisions, hire this person, don't hire that person, you know, treat this patient this way, not that way, that that's what control and supervision means. And can it mean though? Could it mean? Should it mean? Have we in other cases interpreted similar language to mean you can't use money in a way that commandeers a state or private entity? So I think the most direct answer is that that's not it can't mean that in this context, because you have to could it mean it? And do you agree that it means that in other contexts? I control and supervision can mean different things in different contexts. But I just I do want to get out that they have to mean something that's fine. I'll let you do it. I promise. But you'd agree that in some contexts, in some circumstances, that's a possible meeting. I think it may be a possible meeting. I don't think it's the most natural reading. All right. Now you get a go. Go ahead. Got it. Thank you. I appreciate it. So the reason why it can't mean that here is that succeeding provisions of the Medicare statute authorize the secretary to do or actually do directly by Congress. Exactly that sort of standard setting that the secretary is engaged in here. So just take the hospital statute that we've talked about a bunch. 1396 XE. There's provisions where we talk about E9, which is health and safety. The preceding provisions say things like you have to be staffed by doctors and the doctors have to have particular licenses. You have to have a certified nurse on duty 24 hours a day. You have to have a budget plan that meets the requirements of another subsection. Okay. So that doesn't control. But somewhere along the line, you move from general regulations that outline things you, the hospital, have to do to somewhere more directly where you are controlling or supervising. We agree? Yes. There's a sliding scale in there. I'm not sure about sliding scale. I would say standard setting. We can tell from that context. It's a range. Can we agree on that? Sure. Okay. Where's the line? I think that as is often the case with ranges, the line may be hard to draw when you get out towards more granular controls. I think what I can be confident about is that this standard is on the right side of the line because it's consistent with standards in the statute itself that say you have to hire physicians and nurses that meet these qualifications or with other provisions that say you have to train your staff must be trained in this way. I understand that. What that Congress has never, sorry, the CMS, not Congress. We don't have Congress here. CMS has never before said among its standards a vaccination requirement or any other health standard with respect to employees and actions they must take outside the work environment. So for example, could Congress, sorry, CMS also implement regulations about exercise regimes, sleep habits, medicines and supplements that must be ingested by hospital employees in the name of health and safety? And would the government argue that does not control the tenure of those employees? I'm not sure that there'd be a problem with those requirements. I don't think it would be the section 1395 control. I think it would be that it's very hard to characterize those as requirements for the health and safety of patients. But in your view, that would not control the tenure of employees. I think that does not setting standards, even if they're outlandish standards that we think couldn't be set for other reasons, wouldn't be controlled. Still doesn't control, doesn't control, even though they have to take these medications, they have to get this much sleep, they have to do this much exercise every day. And any more, again, I want to be clear, I'm not suggesting the secretary can do any of those things. I'm just suggesting that the reason he can't is not 1395. Because it doesn't constitute control of an employee's tenure or compensation. Correct, because setting standards for employees does not exercise control. Justice Kavanaugh, you mentioned at the beginning that the over billion dollar in costs wouldn't be borne mostly by the federal government. I think you said, can you explain that? Sure, I think in large part by the federal government. So the secretary in estimating the costs said a big driver of the cost was going to be the cost of vaccinations themselves, the shots and the cost of administering the shots. The secretary explained that he was including that in the cost benefit analysis to be comprehensive about the effects of the rule, even though the federal government covers the costs of vaccines for most employees and would cover them here. And then on the question to follow up on Justice Gorsuch's question, what is the story, as you understand it, for why CMS has not previously required flu shots for health care workers or some of the other vaccines that, as you pointed out, the states still insist upon for health care workers? Is there a story there or explanation there for why CMS has not previously done that? I think the secretary laid this out and sort of identified different reasons as to different categories of vaccines. So as to some where state vaccination requirements mean that everyone is basically vaccinated against those diseases already, there was no need for the secretary to do that. The secretary also hasn't acted with respect to flu vaccines. Some states have done that. Not every state has done that. But the secretary explained that this is a pandemic that is a much graver threat than the seasonal flu is and also that these are uniquely effective vaccines and explained that it's that combination, the sort of unique pandemic situation that we haven't seen before and uniquely effective vaccines that led him to choose to adopt that here. Thank you. Justice Barrett? Are you arguing with respect to the facility-specific grants, and this goes back to the questions that Justice Sotomayor asked you after we last talked, are you arguing that those facility-specific grants inform the general grants in 1302A and 1395HH such that we should interpret the general grants as encompassing the authority to impose health and safety measures? Or are you arguing that even if we pretend that these two general grants don't exist, that the facility-specific grants would nonetheless equip the secretary with this authority? I think the latter. I think I'd be making the same argument even if we didn't have the general grants. I think the general grant reinforces the idea that when the secretary sets standards, he has the power to do that through regulations, but we're relying primarily on the specific grants, and I think those would be sufficient even if you set aside 1302. Thank you, counsel. Mr. Rossetti? Mr. Chief Justice, and may it please the court. In early 2020, while millions stayed at home, millions of healthcare workers heroically stayed at work. These same workers are now forced to tune between losing their jobs and complying with the government's vaccine mandate. The secretary's claim of authority to impose this mandate is expansive, unprecedented, and unlawful for two principal reasons. First, the secretary believes a series of vague catch-all provisions scattered throughout the Social Security Act authorize the sweeping mandate, but the relevant text, structure, and context say otherwise. For example, the secretary ignores eight provisions that precede the catch-all provision he primarily invokes, all of which are materially unlike a permanent medical procedure that cannot be undone after a shift is over. Exceedingly clear language is required here because the mandate regulates matters that have traditionally been within the province of the states. Second, the rule is arbitrary and capricious under the APA. The secretary impermissibly extrapolated evidence for one category of facilities to justify regulating all 15 and failed to adequately explain his sudden shift from encouraging vaccination to mandating it. But more fundamentally, the secretary overlooked the critical perspective of rural healthcare facilities in the states and the devastating consequences the mandate will have on rural Americans' access to healthcare. Categorically excluding an entire class from employment will mean that patients in rural Nebraska will have to seek primary and This represents vast stretches of this country where healthcare is not provided by massive institutional providers with tens of thousands of employees, but by smaller healthcare facilities run by local communities. While a 1% loss of staff may be insignificant to the former, it is fatal to the latter. Without the injunction, rural America will face an imminent crisis. The government's day application should be denied, and I welcome the court's questions. Uh, counsel, uh, would you discuss the, um, uh, preemption issue, uh, just briefly? Yes, your honor. Uh, this regulation, the secretary says in this regulation that it is intended to preempt arguably any inconsistent state laws with respect to vaccination requirements. And for example, in this case, the most direct example I can point to your honor is at 20 dash seven dash one, three, four of the Arkansas code that prohibits as a condition of employment, uh, any sort of vaccination requirement. But that's somewhat ironic since he, uh, the, uh, government, uh, relies on, on those, uh, other vaccinations, uh, to argue for this vaccination, but are all of the party states, uh, in the same position with respect to preemption? Your honor, uh, certainly, uh, the district court in this case at the very least cited that Arkansas, Wyoming, and Missouri are similarly situated without respect. And certainly there are other states in our, in the Missouri led coalition that also have laws that are going to be preempted by this regulation. Uh, the key point here, your honor, just like in mass CPA is so long as one of us has one of these laws that would affect, uh, our duly enacted legislation through an unlawful mandate. Uh, we are, it is, it does present an issue on preemption. Now that's independent obviously from other interests that the states have in this case, which is the states are the administrator. It's our providers with respect to Medicaid, with Medicare, we're being asked to facilitate this program for the federal government. We have compliance costs. We have surveyors have to go out and enforce this rule. Uh, all of that, uh, are the state's interest, your honor. Well, the, uh, one final point is, has to go to a standing. You seem to rely on parens patriae a bit. And, uh, would you discuss that, uh, standing and why we should apply that? Well, sure, your honor. And just to be clear, we, we do have various capacities here. We mentioned sovereign interests. We mentioned proprietary, a whole plethora of them. And certainly we did invoke also a quasi sovereign interest in the health and wellbeing of our citizens. For example, this mandate will close the doors of many of these rural facilities that will effectively deprive our citizens of healthcare. And we also are asserting rights under federal law with respect to the APA on many of these claims that that is, but that is not the only basis that we're seeking standing in this case. We have various other capacities that we're suing that are just like the ones I mentioned, your honor. Is that true of all of the parties? Uh, I, I believe so, your honor. Yes. Thank you. There was a, there was a question. Sorry. No, I was just going to ask you about, um, the, the spending clause context. In other words, we're not just dealing with federal law on the abstract. We're dealing with, uh, uh, a provision that says Congress authorized it. Well, the secretary to, uh, uh, ensure compliance with requirements that the secretary finds necessary in the interest of the health and safety of patients. That's very broad. And I, I think you, I, will you agree that you, they have broader authority because it's in a spending clause provision? I mean, you signed it, you signed the contract. Well, sure. And even in the spending clause, I would say two responses to that, your honor. First, even in the spending clause context is just as Alito mentioned earlier, the States are entitled to clear notice. So there is whatever conditions the secretary does state, they have to derive from unambiguous grants of statutory authority. And in this case, your honor, we respectfully disagree with my friend, Mr. Fletcher, because he only cites certain parts of these provisions. For example, with respect to the hospital in this application, he ignores these such other requirements language that precedes the secretary's authority to regulate health and safety. And many of those provisions, for example, E one through eight, none of those talk about immunization. They talk about record keeping. They talk about, uh, uh, discharge procedures. Uh, they talk about really, do you think that the CMS head and that the secretary of HHS are bookkeepers with respect to this statute? Do you think that they don't have responsibility to protect the safety of these two incredibly vulnerable patient populations? Isn't that their principal, uh, responsibility in these laws? Isn't that the most important thing that both of them do? You are certainly the secretary does have authority to set requirements in the interest of health and safety. All I'm saying is you have to look at the statute in context. I'm not saying that HHS is somehow just this record keeping function. I mean, certainly it is important for these facilities to have adequate record keeping. You're dealing with vital records, health records, uh, other things. I wasn't saying that they don't have to concern, be concerned about reference either. I'm just saying, in addition to being concerned about records, this statute clearly gives them by reference to the health and safety, uh, uh, delegations by reference, even to the idea of administering efficiently programs like this. Their principal job is to look after the health and safety of Medicare and Medicaid recipients. And, and with the understanding that those two groups of patients are pretty much the most vulnerable patients there are, either elderly patients or, uh, uh, in the, in the case of Medicaid, unfortunately, uh, poverty has a great deal to do with, um, uh, uh, medical outcomes. So, you know, with respect to these two vulnerable populations and especially vulnerable when it comes to COVID, how can it not be the principal prime responsibility of the CMS head and the secretary of HHS to look out for their health and safety? Because that responsibility that falls in E9 with respect to the hospitals, which is what the secretary has put forward in this application, that authority is informed. The grant of authority in that section is informed by the other provisions in that statute. Doubly so here, your honor, where you have a situation where this court has said that ordinarily, uh, compulsory vaccination, it's not something that ordinarily concerns the federal government that was in Jacobson at page 38. Doubly so here, your honor, because when you're going to alter significantly, alter the balance between state and federal power, something that has traditionally been in the problems in the states, you have to do so with exceedingly clear language. The court said that in Alabama realtors recently, the court said that also in us forest in 2020, that is the kind of language we're asking here. It's not that the the adoption of various infection prevention and control measures, you know, can they say to hospitals, you have to sterilize your instruments. You have to wash your hands in a certain way. Um, uh, one of the things we understand about settings like this one is the way that infections spread and you have to do a variety of things to make sure that you prevent the spread of infection. Can they do that? Your honor? Absolutely. Because that's their job, your honor. Certainly with respect to 13 95, I guess three d three, which goes to skilled nursing facilities, there's expressed language that the secretary can adopt infection control measures to whether there's expressed language of that kind or not. The responsibility to look after the health and safety of vulnerable populations includes requiring infection prevention and measures. Isn't that right? Well, certainly, your honor, if Congress Congress decided to write statutes in very expressed terms with respect to the skilled nursing facilities, and I will submit, I think you're ignoring the question. Put that aside. Suppose that it didn't say infection at all, but it says you have to look after the health and safety of your patients. Does that include infection prevention? It may very well include infection prevention. I guess all I'm saying is, is that in this case, your honor, where there is expressed language that Congress knows how to do that and chose not to regulate. But your view is, is what you're saying is they don't have authority into this. Is that in response to Justice Kagan? They can't say, wash your hands. Can they say if there's a diphtheria academic, we don't want anybody with diphtheria walking into the hospital because everybody will get it. You're saying they can't say that. Is that right? Your honor, there are various, there are various measures. Are you saying that or not? Take the example Justice Kagan gave of the washing hands or sterilizing instruments or the one I just gave you of diphtheria. Can they say it or not? Yes, they can regulate. All right. If they can say that, then why can't they say the same breath? And by the way, we don't want you walking in here in crowds that will spread COVID. And this is how you stop it. Why can they say the one and not the other? Because gloves, taking off gloves and masks, a vaccine. I didn't say that. I said diphtheria. Your honor, the secretary certainly has authority to implement all kinds of infection control measures at these facilities. I'm not disputing that, your honor. Well, all the secretary is doing here is to say to providers, you know what, basically the one thing you can't do is to kill your patients. So you have to get, you have to get vaccinated so that you're not transmitting the disease that can kill elderly Medicare patients that can kill sick Medicaid patients. I mean, that seems like a pretty basic infection prevention measure. You can't be the carrier of disease. But your honor, here we're dealing specifically with a vaccine requirement that again has historically been in the state's province. And if Congress wants to give that authority to CMS, the federal agency here, it has to do so in exceedingly clear language. Or what do I do with this if you want my real, and perhaps you could tell me I'm way off base and I don't mind if you do. But I mean, here we are, ask for a stay. Okay. And in the one case, either this will go ahead or it won't. In the case earlier, it'll go ahead or it won't. And to what extent can we take account of what I think would be relevant with not stays or how we act in the interim and da, da, da, da, da, okay? That there are 750,000 people got this yesterday. But the hospitals are full to overflowing. That there is a problem worse than diphtheria. The people all over the world are getting this and they are here too. And they're dying. That's what we're trying to ask you. Or they're filling up hospital beds and others are dying because they can't get in. Okay? Now, public interest, call it, call it something else, call it what you might. But it seems to me, it's hard for me to believe, but it seems to me that every minute that these things are not in effect, thousands of more people are getting this disease. Okay? And we have some discretionary power. And therefore, will you tell me I can't take that into account? To me, that's unbelievable, but I want to hear it. Your Honor, the public interest is flexible and you can take all that account. All I'm saying is the two statutes, the provisions that the secretary has put forward in this case, we do not believe that they have met their burden of showing a likelihood of success that on the merits, those were lawful exercises of authority. Even in situations where the secretary desires to prevent the spread of COVID, it cannot act unlawfully. Doubly so here again, because this is exactly the kind of requirement that historically has been in the province of the states. And if Congress wants to take that away and give it to CMS or give it to a federal agency, it has to do so in excuse me. Now, I will point out too, in the public interest, Your Honor, keeping, doing away with the injunction, as we said, so it's going to be devastating to vulnerable patients in rural America, in rural Nebraska, no surgeries. The only anesthesiologist in a rural Nebraska hospital, he is not going to be able to go to work. That means no surgeries, emergency C-sections. On that one, I have a question too. I take what you say is correct. All right. I don't know if it is correct, but I'll assume it. Well, if these states, if we act in such a way that over the next two weeks or the next week, these rules go ahead as planned, and people do get inoculated because they have to, or now, if the bad thing that you are talking about then occurs, we'll know it. Because what they're saying at the moment on the other side is there is another bad thing, which is the bad thing that I mentioned at the beginning, that hundreds of thousands of people get this disease. We know what happens from Massachusetts and New York in the old people's homes. They are saying there are two bad things. You are saying the one and the agency, the other is the more predominant. Suppose if based on that division, we let it go ahead, and then if you are right, everybody will know it, and we can draw back. That's not perfect for you, but that is at least something, and it helps protect the people who might otherwise get very sick. Unfortunately, Your Honor, in this case, it is going to devastate local economies. It is going to decimate these local towns that don't draw their pool of applicants from the coast, Your Honor. These are local communities. They run these hospitals, and that is the problem here, Your Honor, those kinds of interests, that perspective was not heard in this context, and that is going to be devastating, Your Honor. Justice Thomas, anything further? Justice Alito? Justice Kagan? Mr. Rossetti, this rural hospital question, you presented some declarations that suggest that there would be labor disruptions. The Secretary took that into account specifically. Basically, he has a different view of the size of the disruptions based on the data that he had, and then in addition to that, said that there are countervailing things. There are countervailing things with respect to the labor force, and the Secretary said some people might come back because they won't have to deal with fewer people out sick, and so forth. Then the Secretary has an important job to do, and that is to balance whatever disruptions there are. The Secretary says there are much less than you say there are, but then to balance those disruptions against the safety of the Medicare and Medicaid recipients whom he is statutorily obligated to protect. It just seems pretty basic to me, as I said, that the first thing that that means in the context of this pandemic is that providers can't be carriers of the disease itself. Then in addition, there are other health benefits. People are not showing up to hospitals because they're afraid of getting COVID from staff, and so they're not coming for their mammograms, and they're not coming for their colonoscopies, and so forth. He has to balance all those health benefits against what you say are these labor disruptions. The question is, I mean, you might have a point. I don't know. I don't know very much about the rural market, but the Secretary, that's his job. Should it be that we decide as against what the Secretary has decided in performing his important function of evaluating these potential disruptions and weighing those disruptions against the health benefits that he sees in that rule? Should we say we think that the disruptions are greater than the Secretary thought, and we further would weigh them differently against the health benefits of the rule? Is that for courts to decide? Your Honor, there is a lot there, and I critical perspective of these tiny communities that, again, he did cite to one example in North Carolina with 35,000, I think it was Novin Health, 35,000 employees as this is going to be insignificant to them. But I think that critical perspective of these tiny hospitals that, again, are 100 or less, these numerous facilities that are going to be devastated by this, that sort of relevant factor, that important aspect of the problem, we don't see how the Secretary could have properly properly when that sort of critical perspective was ignored and these folks did not have a chance to be heard. And in this case, it's almost as if the Secretary put a rock on one side of the scale and a feather on the other. What may work in Detroit and Houston may actually be counterproductive in Memphis, Missouri, or for that matter, in El Dorado, Arkansas. All of those places have different considerations, which is why this historically has been a local and state matter. And the states, again, are free to require it or not require it. Why is this an issue for the states to require or not require? I mean, this is the federal government paying for services. And why doesn't it have a right as the payer for services to specify what services it wants to pay for? I mean, that's Now, in terms of clear rules, I'm having a very hard time understanding how you can say, yes, they could pass a rule that requires people to wear gloves, or they could pass a rule that this rule. And you say, because it wasn't clear. If it's clear enough that they can consider safety and health regulations, why is this particular rule subject to us saying no? Because Your Honor, this court in Jacobson, in various cases, has drawn the line at compulsory vaccination being something that the states do. And when Congress and wait a minute, that's what they do with respect to other issues. But this is with respect to if you want my money, your facility has to do this. Sure, it has to have, it has to serve certain food, it has to serve certain meals a day, it has to give snacks. These are all state issues, usually. But under the spending clause, we're the buyer. The federal government says what it wants to spend its money on. This is not an issue of power between the states and federal government. This is an issue of what right does the federal government to dictate what it wants to buy? Your Honor, it is a vaccine requirement masquerading as a condition of participation. And if Congress intended that, this court has made it very clear that something like compulsory vaccination, even in the spending clause context, which itself demands Congress to speak with a clear voice, it requires... How much clearer do you need for Congress to say then pass regulations that protect the health and welfare of ill people? Perhaps the one example I can think of right away, Your Honor, is an E7 of 1395XE, where Congress acknowledged or spoke with a very clear voice that when it comes to licensing at the state level, that is something that the states do. And that's exactly, I mean, Congress knows how to directly speak to issues that invade into the state area. And it hasn't done it with health and safety. It has given that right to the Commissioner. Thank you, counsel. Justice Gorsuch? Justice Kavanaugh? A couple questions. First, this is an unusual administrative law situation from my experience, because the people who are regulated are not here complaining about the regulation. The hospitals and healthcare organizations, it's a very unusual situation. They, in fact, overwhelmingly appear to support the Secretary's CMS regulations. So I want, and the government makes something of that. What are we to make of that? Your Honor, certainly, there are large institutional providers that may have no problem with this. Obviously, there are smaller ones, very small community hospitals that do have a problem with that. But here, the states have their facilities, they... Very small percentage of the facilities, most of the facilities are private-run facilities, right? This picks up on Justice Thomas's question, like, where are the regulated parties complaining about the regulation? That's how we usually have... The last case is a good example, obviously. There's a missing element here. Well, they're not... Certainly, these sort of entities that would be subject to this rule, like small private facilities that receive Medicaid funding, certainly are not plaintiffs per se, but the states do represent the citizens of our constituencies, like these places that run these facilities, these small community hospitals. We speak on their behalf. And all I would say here is we have made value judgments through our policies to not require vaccination because a one-size-fits-all requirement does not help. And that kind of policy judgment, as expressed through our laws, our duly enacted laws, that would be applicable both to state-run facilities and private facilities, that is what's being preempted here, Your Honor, by this unlawful mandate. And that's how we're speaking in that capacity here, Your Honor, is the folks whose voices were ignored throughout this entire process and shouldn't have been ignored, especially with these devastating consequences. And then second, I think you've alluded to this, but how is a vaccine different in kind from your perspective from, say, the requirement to wear gloves or the requirement to wash your hands or the other kinds of requirements? Because I think if you acknowledge that there's authority to require the latter, then you need to explain why the vaccine's different. I don't think I could say it any better than Chief Judge Sutton did at page 12 of his dissent in the OSHA case, which is masks can come off, gloves can come off. A vaccine requirement, the taking of vaccine is a permanent medical procedure that cannot come off after work is over. That is, there are materially different conditions, materially different procedures at stake. And when you look at the context, for example, in the hospital requirement, 1395XE, nothing in that statute comes close to authorizing this precise mandate in this case, which is going to have devastating consequences for vast swaths of this country, Your Honor. Thank you very much. Justice Barrett. Thank you, counsel. General Murrell, are you still on the line? I am, Mr. Chief Justice. You may proceed. Thank you, Mr. Chief Justice, and may it please the court. This case is not about whether vaccines are effective, useful, or a good idea. It's about whether this federal executive branch agency has the power to force millions of people working for or with a Medicare or Medicaid provider to undergo an invasive, irrevocable, forced medical treatment, a COVID shot. It's a bureaucratic power move that is unprecedented. If it can do that, the question still remains as to whether it properly exercised that power here. The district court answered no to both questions at the preliminary injunction stage, and the court below supported its ruling with a number of well-reasoned conclusions. Now, without even addressing all the underlying basis for the ruling, the government asked this court to jump ahead of the Fifth Circuit and dissolve the injunction, irrevocably changing the status quo in a way that will effectively give the federal government all the relief it seeks. This will create chaos in state provider networks, limit access to care for the poor and needy, and eviscerate informed consent for millions of people. The court should reject the government's request and maintain the status quo because the district court's holdings were correct on all counts. I'm happy to take questions or speak to some of the questions that have already been asked by the court. I'd like you to address whether or not, or at least to what extent, this rule preempts rules of your state. Justice Thomas, it does preempt rules of some of the states in our coalition. I don't know that it preempts rules in every state, but it affects Alabama, Louisiana, and Montana, and different ways, different laws. Could you address, as I asked earlier, the parens patriae standing? I think that's going to be an important matter, and I'd like you to address it. So I think we have parents patriae standing to protect the interests of our citizens, but that is not the sole basis on which we appear in these cases. And there's been some questions about Medicare and Medicaid. I think the government has conflated those two programs in an enormous way, because just in Louisiana alone, I can tell you that 41% of our budget is Medicaid funding. So we have enormous, enormous interest in the way these programs operate, and that's one of the reasons why there are express consultation requirements built into the statute. Thank you. General, do you agree with the district court statement that COVID, just a quote, COVID no longer poses the dire emergency it once did? Your Honor, I think that that is a shifting, those are shifting sands. Obviously, COVID conditions can change at any given time, and they have. What is your other basis for standing? Our basis for standing is that we are being regulated directly by this rule. We have to Medicaid funding, and that is a program that is implemented entirely by the state. I don't think I could underestimate enough the impact on the states and their provider networks. That's precisely what the declarations that we submitted, and I think many that were submitted in the Missouri case also go to, is the effect on our ability to actually provide access to care, which is the actual primary goal of this program. I'd like to touch on the spending clause issue just a bit. It was a broad provision that you agreed to, which authorized the secretary to impose requirements that the secretary finds are necessary in the interest of the health and safety of patients. Why did that not give you adequate notice that something like this could be enacted? I don't think that gave us any more notice that that could be enacted. No one even expected COVID, so how could we possibly have expected to have the federal government through a spending condition imposed upon us years after this program was created? It co-opted a quintessential state police power for deciding whether its citizens should be vaccinated or not. That's just not something that we could have reasonably anticipated, given the general broad language that is put into the statute. Again, I don't think that the primary role is to actually provide directly for the health and safety of individuals. I think it's up to the state to implement these programs or through Medicare to reimburse for health care to individuals. I would also point just to the secondary aspect of any spending clause. Argument also turns on the voluntarily and knowingly accepting the terms, and so I think that goes straight to your question. Respecting that limitation is absolutely critical to respecting the balance of the state's sovereignty in this program. How does that determination? It is what the Secretary finds, and it's what the Secretary finds necessary. I'm not saying there's not some limit there, but I don't know why a provision addressing an infectious disease of this scope is beyond the Secretary's determination that the mandated issue here is necessary. We've never taken the position that the Secretary has no authority to address it at all. We're saying that they can't do this, and they've never, ever, ever done anything like this, which they acknowledge. The Solicitor General, in the argument that preceded this one, also pointed and conceded that where there are other textual and structural cues in a statute that may be inconsistent with the agency's jurisdiction, that you should be looking at that terms of the discretion that you give and when you evaluate whether this is a question or an issue that falls within the general discretion and scope that was granted earlier by Congress, and here there are multiple cues that conflict directly with the broad, broad scope and grant of authority that they're claiming here. Q Do you think we need to find that you have Parents Patriot standing in order to take into account the interests of employees within your state who do not want to be vaccinated? Is that a standing question, or is it a question that can be taken into account in the context of determining what the statute means and whether it satisfies whatever requirements there may be under the spending clause? A I think it's both. I certainly believe that you can take it into account as part of our standing. We have independent grounds for standing. When you get past that question, I think it also relates to the question of whether it's actually controlling the tenure of employees. I think it directly conflicts with that. I mean, Justice Alito, there's really no question, I think, in our mind that this was a pretext that the entire, as the Chief Justice alluded to, that this was a workaround. The government intended to tether all of these restrictions together, all of these mandates together to vaccinate as much of the American public as they could touch. And in this particular rule, at the Federal Register 61607, that the government even acknowledged that the most important inducement was the fear of job loss. This is targeted at people. It's not targeted at facilities. And they've never done anything like this before, precisely because there are structural prohibitions against it in the statute. And where we are in this procedure is extraordinary. They want to dissolve an injunction, parts of which have not even been contested, so that they can upend the status quo, which will disturb enormously our provider network. Well, all that's true, but I'd like to get your response. I mean, there's some truth to what you say, but I'd like to get your response to what I asked previously twice, really. We set in both these cases something as the inheritor of a court of equity. And we do that particularly in respect to stays, whether you call them administrative or not. And that may be both sides. And in the other case, that's why I say there's a side in each case that is predicting harm if the agency rule goes into effect. And the other side predicts serious harm if the agency rule does not go into effect. And as you heard in the OSHA case at the last minute, on the one hand, if they have to start complying with this, they have to get plans and the employers are hurt. On the other hand, if they don't start to get those plans ready, it looks like a lot of people will get sick and take up hospital beds or worse. So in weighing those equities, why don't we have to take and avoiding even by a minute or a second? Because if you divide 750,000 by the number of seconds in a day, you get a lot of people. And why do we not have to take those things into account, see how the government would balance them, see if that is reasonable, and be very wary at the least of interfering with rules that will in fact save people's lives or hospital beds or from getting the disease? You see what I am saying? I'm asking, I'm putting a burden on you to say, yeah, that's what I do. I understand the question. I think, I think first of all, these aren't just plans. Here, this rule is different. There's no test and mask exception. This is in a vaccinate and it's a short, short shot clock. And so they do not have a choice. They have to be fired or they cannot be hired. And so it handcuffs our providers in a way that is, that is extraordinary and immediate. And that the status quo right now is that they still comply with all the other rules of Medicaid and Medicare, which means they have infectious disease control measures in place. They are doing the very best job that they can. They need all the boots on the ground. This rule will actually change that. That will, it will immediately change that. So I think it is extraordinarily different. And it also comes up in a different context. It comes up in the context of a preliminary injunction, multiple injunctions, but specifically in ours where they did not even contest certain aspects of it. So they present to you a request for a stay that does not even contest certain aspects of an injunction that they want you to do. Thank you. Counsel, I'm having a very hard time trying to do this state power argument with respect to a standing clause program that doesn't affect the states directly except as proprietors. Because as proprietor of state run facilities, those are the ones that are affected by this rule. The private facilities are, and as one of my colleagues noted, Justice Kavanaugh, we don't have many amici of them complaining. But putting that aside, I am having a hard time understanding how and why a rule like this is so substantially different than the volumes of rules that CMS has with respect to so many issues involving health and welfare. They tell you how high the bed has to be. They tell you how close hand sanitizers have to be. This is before COVID. They have so many different rules that one could arguably say belonged within the state's rights that give me a working principle that says to the federal agency charged with the health and safety of patients who believes that the only way to protect these vulnerable patients is by this one step, why that should tie their hands. You may argue otherwise that the other ways of doing it are effective, but they have decided in this particular context with the vulnerability of these particular populations that the other steps are inadequate. Your Honor, there's two aspects to your question, and I'd like to speak to both of them. One is the issue of whether we're just proprietors. We're not just proprietors, and I think the court effectively discussed that in NFIB versus Sebelius. Medicaid is an enormous program where states are contracted with the federal government, not providers. The providers are contracted with the states, so it is important, I think, to keep that distinction between these two programs. To your question about the dividing line, the dividing line here is precisely why we are in a question of major questions, Dr. Lance, because they have never done this for at least since the Jacobson case, and before that, predominantly, this has been a question protecting the health and safety of individuals and exercising this kind of power to force the individual to submit to a medical treatment has never, ever been something that has been authorized by Congress or done by an agency on an emergency basis. Counsel, I don't mean to interrupt you, but we've never had a situation like this one before. It's unprecedented. But I don't think in this case that justifies them co-opting a quintessential state police power. In fact, the opposite is true. It only points up the need to evaluate this in the larger context of whether Congress, I mean, Congress didn't do this, by the way. I mean, the Congress, just as recently as last summer, changed some of the discrete statutes specifically related to skilled nursing and nursing homes and authorized certain measures for strike teams to augment staff in those facilities due to COVID outbreaks, but they didn't authorize vaccines for staff. I think there are cues. There are cues in the statute. There are cues in the history and structure and the precedence of this court that support weighting and maintaining the status quo as the district court below did and the Fifth Circuit did. Justice Thomas, anything further? Justice Breyer? Justice Alito? Anything further, Justice Sotomayor? I just want to say the Sixth Circuit didn't, correct? The Sixth Circuit in the OSHA case operated differently. Yes. Yes. Justice Kagan? Justice Gorsuch? Justice Barrett? Thank you, counsel. Rebuttal, Mr. Fletcher? Thank you, Mr. Chief Justice. Just three quick points. I'd like to start with the interpretation of the statutes before you that the other side is offering, because I don't hear them to contest that the Secretary's authority to set conditions for patient health and safety, even in the statutes that don't include that language. I don't hear them to be disputing that the Secretary can adopt infection control mechanisms or require people to wear gloves or do other things of that nature. Instead, their submission seems to be that vaccines are different. And I think the problem with that is that they haven't really given you a basis to ground that in the statute. The first thing that they've said is vaccination is typically the prerogative of the states. And of course, that's true in some sense, but we're talking here about a federal spending program. And the regulation of medicine is typically the prerogative of the states. Usually, it's the states who require hospitals to make sure their employees wear gloves or they follow the fire code or they have sprinklers, things like that. But no one disputes that Congress has given the Secretary the authority to make sure that providers who are providing care under the aegis of the federal Medicare and Medicaid program live up to standards set by the Secretary. That's what the Secretary has done here. The other thing that I've heard him say about why vaccines are different is that you can't take them off, that vaccines are somehow different than gloves or other safety measures. And so some special specific authorization ought to be required. I just don't think that can be squared with the context of the health care industry. Vaccination requirements are common throughout our society. They're particularly common for health care workers. They've been adopted voluntarily by providers around the country. You have virtually the uniform view of the medical community telling you that this is the best way to be vaccinated. It would be bizarre to say that the Secretary's authority to protect the health and safety of Medicare and Medicaid patients does not include the authority to adopt the measure that you see other regulators adopting, the medical community urging, and other providers adopting voluntarily. The whole point of the statute is to let the Secretary make sure that the standards of care for Medicare and Medicaid patients meet best practices. And that's what he has done here. The second point I want to make, Justice Barrett, goes back to the colloquy that you and I had earlier about some of the different statutes. I hope we persuaded you that we're about all of them. But in case we have not, I just want to make the case that it actually is worth the candle in this state posture to go provision by provision. So as we explained, 97 percent of the employees affected by this regulation are covered by statutes that include the express health and safety language. Even if you just narrow it down beyond that, three categories, the largest three categories of providers, hospitals, home health agencies, and long-term care facilities, account for more than 90 percent of the covered workers. This is shown at the 1,603. All of those provisions have expressed health and safety language of the sort that we've been discussing. And two of them, long-term care facilities or nursing homes and home health providers, actually include the extra provisions that we cite at page six of our reply that says the Secretary has not just the authority to ensure health and safety, but also the duty to do so. And I think at an absolute minimum, it's worth letting the world go into effect as to them. And finally, Justice Breyer, I want to come back to a point that you've raised a few times about equities, because we are here on a stay. And I think a couple of observations to make about the equities. The first is a point that Justice Kavanaugh raised. You don't have providers before you here. You don't have workers before you here. Instead, providers and workers overwhelmingly support the vaccination requirement. Instead, you have before you states who do operate some facilities covered by the rule, but only a tiny fraction of them. The second thing I'd say is that even as to the providers and the workers who are covered by the regulation, some of my presentation has suggested that if the preliminary injunctions are stayed and the rule goes into effect, that means that tomorrow people are going to be out of a job. And that is not true. The Secretary has put out guidance after the Fifth Circuit narrowed the previously nationwide injunction to cover only the plaintiff states here, put out guidance giving regulated entities 30 days to come into compliance as to the first shot, 60 days to come into compliance as to the second shot, and making clear that even if a regulated entity has not met full compliance by that 60-day deadline, if the entity is at 90 percent compliance and has a plan to come into full compliance within 30 days, the Secretary won't take enforcement action. Even if that isn't met, even if at the end of 90 days there's still not full compliance, the Secretary has always exercised enforcement discretion before terminating a provider from the program. And one of the things the Secretary has considered is access to care issues of the sort that the other side has raised. So there are ways to address some of the problems that friends have relied on, even if the rule goes into effect. On the other side of the ledger, and this is where I'll close, if the preliminary injunctions remain staid, then we know what the consequence is. We know that this urgently needed measure is not going to be in effect to protect Medicare and Medicaid patients in half of the country during a pandemic. And I think the Secretary found, and I don't think anyone seriously disputes, that any delay in the operation of the rule will cost lives and cause unnecessary, serious illnesses. We ask that preliminary injunctions be stayed. Thank you, Counsel. The applications are submitted.